UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
NM, Individually and on Behalf of EK and LK,
Minors,

                           Plaintiffs,

      -against-

HEBREW ACADEMY LONG BEACH, LANCE
HIRT, Individually and in his Official Capacity as
President of Hebrew Academy Long Beach,
RICHARD HAGLER, Individually and in his
Official Capacity as Executive Director of Hebrew
Academy Long Beach, DOVID PLOTKIN,
Individually and in his Official Capacity as
Principal of Hebrew Academy Long Beach, MARY
ELLEN ELIA, in her Official Capacity as
Commissioner, New York State Education
Department, DR. HOWARD M. ZUCKER, MD, JD,
in his Official Capacity as Commissioner, New York
State Department of Health,

                         Defendants.
-------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

15-CV-7004(ADS)(AYS)

## APPEARANCES:

**Patricia Finn Attorney, P.C.**
*Attorney for the Plaintiffs*
628 Piermont Avenue
Piermont, NY 10968
     By:   Patricia Finn, Esq., Of Counsel

**Putney, Twombly, Hall, & Hirson LLP**
*Attorneys for the Hebrew Academy of Long Beach, Lance Hirt, Richard Hagler, and
Dovid Plotkin*
521 Fifth Avenue
New York, NY 10175
     By:   Philip H. Kalban, Esq., Of Counsel

**New York Attorney General's Office**
*Attorneys for Mary Ellen Elia and Dr. Howard Zucker*
200 Old Country Road, Suite 240
Mineola, NY 11501
     By:    Ralph Pernick, Assistant Attorney General

**SPATT, District Judge:**

This case involves a constitutional challenge to New York's requirement that school-aged children be vaccinated against certain communicable diseases in order to attend classes.

The Plaintiff, identified for purposes of this action as NM, commenced this action on behalf of herself and her two minor children, identified as EK and LK (together, the "Minors," and collectively with NM, the "Plaintiffs"), against the Hebrew Academy of Long Beach ("HALB"), its President Lance Hirt ("Hirt"), its Executive Director Richard Hagler ("Hagler"), its Principal Dovid Plotkin ("Plotkin," together with HALB, Hirt, and Hagler, the "School Defendants"), as well as New York State's Commissioner of Education Mary Ellen Elia ("Elia"), and New York State's Commissioner of Health Howard M. Zucker, M.D., J.D. ("Dr. Zucker," together with Elia, the "State Defendants").

The complaint alleges violations of federal and state laws, including causes of action based on Section 2164 of the New York Public Health Law; Section 296 of the New York Human Rights Law; the First, Ninth, and Fourteenth Amendments to the United States Constitution; and Article 1 of the New York State Constitution.

Presently before the Court is a motion by the Plaintiffs, brought on by Order to Show Cause, seeking a preliminary injunction directing the School Defendants to

permit the Minors to attend HALB during the pendency of this lawsuit without receiving the required vaccinations.

## I.      Background

### A.      Overview of the Relevant Statutory Provisions

Before delving into the specific facts of this case, the Court finds that it will be helpful to provide an overview of the legal framework governing the intersection of religious beliefs and state-mandated vaccinations.

Section 2164 of the New York Public Health Law (the "PHL") imposes a baseline requirement that school-aged children be immunized against certain enumerated diseases.  In relevant part, the statute provides as follows:

> No principal, teacher, owner or person in charge of a school shall permit any child to be admitted to such school, or to attend such school, in excess of fourteen days, without the [appropriate certificate by an administering physician] or some other acceptable evidence of the child's immunization against poliomyelitis, mumps, measles, diphtheria, rubella, varicella, hepatitis B, pertussis, tetanus, and, where applicable, Haemophilus influenza type b (Hib), *meningococcal disease*, and pneumococcal disease . . .

PHL § 2164(7)(a).

However, the PHL carves out two express exemptions from this general requirement, namely: (i) a medical exemption for children whose pediatrician certifies that the required immunizations may be detrimental to their health, <u>see</u> PHL § 2164(8); and (ii) a religious exemption.   Relevant here, the religious exemption removes from the statute's purview "children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to" the

practice of vaccinating, and, as to them, requires no certificate of immunization as a prerequisite to their attendance at school.  See PHL § 2164(9).

With this basic statutory scheme in mind, the Court turns to the relevant facts of this case, which are drawn primarily from the testimony provided during a related evidentiary hearing held on January 4, 2016, together with the affidavits and supporting exhibits submitted in connection with the Plaintiffs' motion.

## B.    The Parties

The Defendant HALB is a school system comprised of four individual educational institutions, namely, the Lev Chana Early Childhood Center; HALB Elementary; the SKA High School for Girls; and the DRS High School for Boys. HALB offers a bicultural education in both general and Judaic studies from nursery school through high school, and has a total enrollment of approximately 1,675 students.  See Dec. 21, 2015 Affidavit of Richard Hagler ("Hagler Aff."), ¶ 3.

The Plaintiff NM is a graduate of Touro College, where she earned a Bachelor's degree, and Fordham University, where she earned Master's and Doctorate degrees in Psychology.  The record is unclear as to whether NM is currently employed.  She and her husband, a practicing attorney, have three daughters, ages 11, 8, and 3.  The Court notes that the Minors in this case, namely, EK and LK, are the Plaintiff's eldest two children.

NM is a devout Orthodox Jew and has raised her three daughters in the Orthodox Jewish tradition.  For reasons that NM alleges are inexorably linked to her faith, she has not vaccinated her children and does not intend to do so.

## C.    HALB's Method of Evaluating Requests for Religious Exemptions

From 2010 to 2015, the Minors EK and LK attended HALB.  During that time, neither child was vaccinated as required by the terms of the PHL.  In 2010 and 2012, NM applied for religious exemptions on behalf of her daughters, which were granted in both instances.  See Dec. 4, 2015 Affidavit of the Plaintiff ("Pl. Aff."), ¶¶ 24-25.  However, in 2015, HALB reevaluated the children's entitlement to an exemption.

The Plaintiffs contend that this resulted from a new policy instituted by HALB at the suggestion of its Board of Directors, namely, to deny religious exemptions to its students.  In this regard, NM asserted that, in May 2015, she received a telephone call from the school nurse, advising her that HALB "was instituting a policy change and would no longer be accepting religious exemptions." Pl. Aff. ¶ 26.  Consistent with this assertion, the Plaintiffs submitted an e-mail, dated May 21, 2015, from an unidentified sender, which, in turn, attached a memorandum purportedly issued by the school nurses, namely, Devorah Sokol RN and Wendy Weiss RN.  See Compl., Ex. "2."  The memo states, in part, that "HALB does not accept any Religious Exemption to Immunization.  Only a Medical exemption can excuse a student from a vaccine, beliefs do not."  Id.

HALB's President, Lance Hirt, testified that the information circulated by the school nurses was inaccurate and did not reflect any official position of HALB. In this regard, the School Defendants deny that any "new policy" regarding religious exemptions was enacted, or that HALB ever determined to categorically

refuse religious exemptions to its students. However, the School Defendants do acknowledge that, in mid-2015, they altered HALB's internal procedures for evaluating requests for religious exemptions, in order to make the process more intensive.

In particular, Hirt testified that, in early 2015, numerous parents had begun contacting the administration in response to reports of a measles outbreak in California. Hirt stated that these concerned parents inquired into HALB's preparedness for such an event, as well as the adequacy of the measures being employed to prevent such an outbreak among their own children. According to Hirt, these events prompted HALB to assess the sufficiency of its procedure for determining which students should be excused from receiving the State-mandated vaccines.

Hirt testified that, upon reflection, HALB found its own enforcement of PHL § 2164 to be below the legal standard. In particular, he stated that the school had not previously conducted any meaningful review of students' applications for religious exemptions, and that the administration had simply "rubber stamped" such requests without conducting due diligence. In this regard, Hirt testified that the Plaintiffs' requests for religious exemptions in 2010 and 2012 were likely approved without any inquiry into the sincerity or genuineness of their alleged religious beliefs against the practice of vaccinating.

Accordingly, in 2015, HALB began "strict enforcement" of the State immunization law by, for example, closely scrutinizing the reasons proffered by

parents seeking religious exemptions for their children.  See Hagler Aff. ¶ 15 ("We understand it to be the school's duty to assess what the motivation of a family is and whether a religious basis is genuinely held").  To that end – and consistent with Hirt's testimony that the school nurses had inaccurately advised parents of a new school policy against religious exemptions – on July 10, 2015 HALB's Executive Director Richard Hagler sent a letter to the Plaintiffs, stating as follows:

> We write to correct any misunderstandings and to request any documentation and information that may further support your request for a religious exemption from the immunization requirements of New York State law.
>
> None of the HALB schools . . . admits or is permitted to admit students who have not been vaccinated in accordance with State law, unless those students fall within the two statutorily provided exemptions.
>
> We require, as we must, the appropriate certificate of immunization for every student as mandated by the above-referenced New York laws [N.Y. Educ. L. § 914; PHL § 2164; 10 N.Y.C.R.R. § 66-1.3].
>
> Based on our current understanding of the requirements of State law, we have questions about the genuineness and sincerity of the religious belief basis for your refusal to have your children immunized as required by these statutes.
>
> Accordingly, we request that you either provide us with the state-mandated certification of immunization for each child who seeks to enroll or that you contact the undersigned to arrange for a meeting to discuss your request for an exemption from the statutory and regulatory requirements that we are bound by law to enforce.

Compl., Ex. "5."

In a supporting affidavit, Hagler stated that similar letters were also sent to eight other families who had applied for religious exemptions.  See Hagler Aff. ¶¶ 4-5.

**D.     The Evaluation Process**

Hagler stated that, of the nine families who received the letter, quoted above, three immediately began the immunization process so that their children could attend HALB; two families withdrew their children from HALB; and four families, including NM and her husband, accepted the school's invitation to meet and discuss their respective requests for an exemption.  <u>See</u> Hagler Aff. ¶ 6.

On September 2, 2015, NM and her husband attended a meeting at HALB with Lance Hirt, Richard Hagler, and a pediatrician named Dr. Evan Pockriss, whose own children attend HALB.  NM and her husband appeared for this meeting with their counsel, Patricia Finn, Esq.

In a supporting affidavit, NM described the meeting as a "setup."  However, she sets forth few factual details to support this characterization.  In particular, NM states only that, in her opinion, "[t]here was no genuine interest shown in understanding the religious nature of [her] beliefs."  Pl. Aff. ¶ 41.  Although she acknowledged being asked by Lance Hirt where in Jewish law there existed a prohibition against vaccinating, she stated that Dr. Pockriss conducted most of the questioning, and that his inquiries were largely "medical[ ] or health related."  <u>Id.</u>; Hrg. Tr. at 35 ("Basically the only questions directed to me . . . were directed to me by the pediatrician").

In his opposing affidavit, Richard Hagler disputes NM's account of the meeting and states that she made statements to the HALB representatives which are inconsistent with the position she now takes for purposes of this lawsuit.  In

particular, according to Hagler, NM acknowledged during the meeting that she had ingested prenatal vitamins during her pregnancies and described herself as the "vitamin queen." Hagler Aff. ¶ 14. Further, according to Hagler, NM indicated that she would administer antibiotics if her daughters required them; that she keeps no sugar in the house; and that her daughters "have 'almost no candy.'" Id. Hagler stated that NM's attorney had remarked at the meeting that laws which exclude unvaccinated children from schools "make no sense; that children vaccinated in the first weeks of school are contagious; and that even dead viruses can turn out to be live." Id. ¶ 17.

Lance Hirt testified consistently with this account. He stated that the interview committee had been "shocked" when NM and her husband appeared for the meeting and "didn't actually talk about sincere religious beliefs with any real focus." Hrg. Tr. 142.

Based on NM's presentation at the meeting, the interviewers unanimously agreed that her reasons for not vaccinating the Minors "were based on perceived health concerns and not sincere religious convictions." Id. ¶ 10. In this regard, Hirt testified that, "[i]n the judgment of [the] committee . . . the motivations of the plaintiff were medically oriented and not religious." Hrg. Tr. 134. He testified that NM apparently believed that she "had a better way to protect [the Minors'] health, which was through diet," and that "introducing a foreign substance was not something [she] thought was a good idea from a health perspective." Id. at 140. Thus, according to Hirt, "nothing that [the committee members] heard during those

discussions indicated to [them] that it was a religious belief . . . that was driving their position on vaccination." Id. Rather, the conclusion drawn by him and the other interviewers was that NM "felt strongly about living a certain healthy lifestyle" and was seeking "a religious perspective that was consistent with" that lifestyle. Id. at 140.

Hagler also disputed NM's assertion that the committee had been uninterested in the sincerity of her religious convictions. In particular, Hagler stated as follows:

> During the meeting with plaintiff and her husband, despite our direct questions for them to explain their religious basis for not vaccinating, they (mostly plaintiff) spent the entire meeting discussing medical concerns and notions of putting a body at risk through the introduction of foreign substances. They told us our way of thinking about vaccines was just wrong and how our science is flawed but said almost nothing about religious beliefs. Ironically, they explained that once they decided not to vaccinate, they then went to consult with Rabbis to make sure they could find a basis in Jewish law to support their decision not to vaccinate.

Hagler Aff. ¶ 16.

On September 4, 2015, Hagler sent a letter to NM advising her that HALB had rejected her application for a religious exemption. See id., Ex. "B."

However, the Court notes that, consistent with the School Defendants' contention that HALB does not have a blanket policy against granting religious exemptions to qualified students, there is evidence that, following a similar meeting, the administration had been "convinced of the sincerity and genuineness of the religious objections of one of the families, and, therefore, accepted its application for a religious exemption." Id. ¶ 10. In opposition to the instant motion, the School

Defendants submitted a letter that HALB sent to this family advising them of its determination. See Dec. 21, 2015 Affidavit of Philip H. Kalban, Esq. ("Kalban Aff."), Ex. "A."

On September 7, 2015, NM's husband sent a lengthy e-mail to Lance Hirt and Richard Hagler seeking reconsideration of HALB's decision not to grant the Minors a religious exemption. See Hagler Aff., Ex. "C." Although NM testified that her husband was solely responsible for preparing the e-mail, see Hrg. Tr. at 93, the Court nevertheless finds that there is a reasonable basis for imputing the husband's statements regarding their religious beliefs to NM as well.

In this regard, the Court notes that the e-mail is signed on behalf of both NM and her husband. Further, NM testified that she and her husband share substantially the same religious beliefs, and that, following the school's denial of her request for a religious exemption, she did not supply HALB with any additional information clarifying her own beliefs or how, if at all, they differ from those expressed by her husband. See Hrg. Tr. at 62-63 ("Q: [I]s he [your husband] in agreement with you as to your religious beliefs contrary to vaccination? A: Yes, we are in complete agreement"); see also Pl. Aff. ¶ 20 ("My husband shares my religious convictions, and with the approval of our Rabbi, agrees that we must abstain from vaccinating our children").

Further, the September 7, 2015 e-mail from NM's husband outlines a philosophy that is consistent in all material respects with NM's affidavit and hearing testimony, namely, that Jewish law commands its followers to guard their

health and refrain from defiling their bodies. NM asserts that these commandments are inconsistent with the practice of vaccinating, which, by its nature, involves puncturing the skin, introducing a foreign substance into the blood stream, and undermining the Jewish belief that our natural immune system is sufficient to ward off disease.

In this regard, NM's husband states in the e-mail that his and NM's decision not to vaccinate the Minors "stems from a complex interplay of *Halachic* imperatives to guard [their] health, discussions with [their] Posek, Rabbi Chait, and [the Minors'] doctor, Dr. Lawrence Palevsky." He further states that NM "was raised in a home where nutrition and health were synonymous to keeping a kosher home" and that "guarding your own health is actually a *mitzvah*." The e-mail includes numerous citations to religious authorities such as Maimonides for the proposition that "there is a positive obligation in the Torah to guard against bodily injury." The e-mail states that "[i]t is not enough to deal with health issues as they arise; we must take precautions to avoid danger. That is why exercise, a healthy diet and following your doctor's recommendations are obligations that stem from the Torah and are not voluntary." It further states that "[i]t is virtually impossible to separate the area of health from the Torah in any way."

Of prime importance here, NM's husband states that:

Our pediatrician educated us extensively on the pros and cons of vaccinating our children. . . . After discussing this at length with our doctor, we knew that we still had to seek *Da'at Torah* before making this significant decision. We discussed this with Rabbi Chait, who informed us that the *Halacha* says to follow our doctor, and that in our case, it would be a *Halachic* problem if we failed to follow our own

doctor's recommendations. While our decision not to vaccinate was supported by our doctor and resonated with all of our healthful lifestyle practices, ultimately our decision hinged upon getting a *halachic* stamp of approval from my Rebbi. It is for this reason that we are seeking an exemption only on religious grounds.

<u>See</u> Hagler Aff., Ex. "C."

In his opposing affidavit, Hagler stated that the September 7, 2015 e-mail served to reinforce HALB's previous determination that NM's reasons for not vaccinating her children were, in fact, health-based concerns couched as religious doctrine. <u>See</u> Hagler Aff. ¶¶ 21, 26 ("Just because their rabbi told them to 'follow [their] doctor . . .,' [ ] does not transform their health concerns into a religious 'belief' ").

Hirt also testified that the September 7, 2015 e-mail did not alter his decision. In particular, he testified that this e-mail made the committee feel "more secure in [its] decision" and left HALB feeling as if it had "made the right decision" following the September 2, 2015 interview. Hrg. Tr. at 146. According to Hirt, the e-mail "made it clear to [the committee] that the [Plaintiffs] had a decision that they made on medical grounds in discussions with their physician, and only then did they go to make sure that it was in compliance, that it was okay under Jewish law not to vaccinate." <u>Id.</u>

On September 7, 2015, Hagler sent a responsive e-mail to NM's husband indicating that there had been no change in HALB's position on the matter, and that, pursuant to New York law, the Minors would be permitted to attend school for

two weeks, at which time NM would be required to provide a certificate of immunization.  See Compl., Ex. "10."

**E.      The Exclusion of the Minors from HALB**

The Minors attended HALB for fourteen days, until October 8, 2015.  On that date, Hagler sent a letter to NM advising her that, because the Minors had not been immunized, and had not demonstrated that they had begun the immunization process, they were no longer permitted to attend HALB.  See Compl., Ex. "12."

NM testified that she did not take any steps to enroll the students in a different Hebrew school, where a religious exemption might be granted.  See Hrg. Tr. at 71-72.  Rather, the Minors have been home-schooled since October 8, 2015.

**F.      The Instant Motion**

On December 10, 2015, the Plaintiffs commenced this action.  The next day, December 11, 2015, they moved this Court by Order to Show Cause for preliminary injunctive relief.  In support of that request, NM submitted an affidavit setting forth the nature of her allegedly genuine and sincerely-held religious beliefs contrary to vaccinating her children.

In her affidavit, NM asserts that her religious beliefs are rooted in the holy Torah and its commandments, which govern all areas of her life.  See Pl. Aff. ¶ 5. In this regard, the Torah commands that "the human body is God's perfect creation . . . and its purity and integrity must be maintained."  Id. ¶ 8.  To that end, "[m]any of God's commandments address the care of the human body via precautions regarding cleanliness and the instruction to keep the body healthy

without defilement." Id. ¶ 10. For example, "[t]he Torah specifically rejects the acts of making cuttings in the flesh, imprinting marks, and defilement of the body via impure substances." Id. ¶ 11. Thus, to the extent that "[v]accines inherently contain disease and other impure substances, [ ] their inoculation into the body is a violation of the dictates of [her] religious beliefs." Id. ¶ 13.

According to NM, "Jewish law prohibits the prophylactic use of medical interventions . . . for healthy individuals." Id. ¶ 16. Instead, she contends that "prevention . . . primarily through nutrition" is "the highest form of healing" and that which most closely comports with the Judaic precept that observant Jews "live in accordance with the order of creation in nature." Id. ¶¶ 15, 17. In this regard, NM stated that she "strive[s] to live as naturally and healthfully as possible" and that her "pursuit of purity pervades [her] whole way of life, including eating habits and methods of combatting illness." Id. ¶ 18.

On December 16, 2015, the Court signed the Order Show Cause and directed the parties to appear for an evidentiary hearing on December 22, 2015. The purpose of the hearing would be to develop the record as it related to one discrete factual issue, namely, whether NM held genuine and sincere religious beliefs contrary to the practice of vaccinating, such that a mandatory injunction should issue during the pendency of this lawsuit. The return date of the Order to Show Cause was subsequently adjourned to January 6, 2016.

## G. The Hearing

All parties appeared by counsel for an evidentiary hearing on January 6, 2016.

At the hearing, at which only NM and Lance Hirt, the President of HALB, testified, NM reiterated her belief that the Torah commands her "to keep the body completely whole and pure without defilement." Hrg. Tr. at 16. In this regard, she referred to Jewish beliefs against making cuttings in the flesh, but did not supply any specific quotations. See, e.g., id. at 43, 73-74. She also reiterated her belief in prioritizing natural remedies over invasive medical treatments, stating that "any disease which can be treated naturally should be treated in a natural way." Id. at 38, 40 ("We follow[ ] the way of the Rambam to follow natural health").

Further, NM testified that Jewish law places an emphasis on preventive medicine, but not prophylactic treatment for healthy individuals. See, e.g., id. at 39 (testifying that "the emphasis is on preventive medicine"); id. at 63 (testifying that prophylactic medicine is "forbidden"). Apparently, according to NM, when it comes to treating illness, there is a preferred *halachic* method, namely, natural non-invasive means, and a method of last resort, namely, invasive medical practice. Id. (explaining that her interpretation of Jewish law "is all about using food as medicine" and that the famous Hebrew scholar Maimonides "instructs us to always go from a natural to the more invasive").

Of importance, NM does not appear to assert that her religion forbids the practice of vaccinating; only that she feels obligated to first pursue less invasive

means of disease prevention.  See, e.g., id. at 39-40 ("[W]e were always taught that modern medicine was not to be rejected, of course not, but it was always a method of last resort.").  In fact, she specifically testified that the duty of observant Jews to protect themselves from disease "does not preclude" the use of immunizations; it simply "says it is not the preferred method."  Id. at 99.

In this regard, NM testified as to her understanding that, once she reached a personal conclusion on the issue of vaccinations, her beliefs took on the force of Jewish law, and the Torah required her to follow her conscience in that regard.  See id. at 42 ("The system of Halacha is a personal one . . . There are a lot of personal subjective issues. . . . What we understand from our consultation with [Rabbis] is that . . . once we had come to a conclusion . . .  these beliefs took on the rule of law and that we were not allowed to act against our conscience"); see also id. at 34 (stating that her personal beliefs are what "really matter[ ]").

It was brought out on cross-examination that, despite her reliance upon Jewish teachings against making cuttings in the flesh, NM has her ears pierced. See id. at 75.  It was also brought out that NM has permitted herself to be injected with Novocaine during dental procedures.  See id. at 111.  Also, the Minors use sunscreen, which NM agreed was "a preventative, to prevent them from getting sunburn which [ ] in later life can cause cancer."  Id. at 91. It was also brought out that she ingested prenatal vitamin supplements during her pregnancies because they are "practically required by every doctor."  Id. at 89.  In this regard, she testified that, in order to guard their health, her family "take[s] a lot of dietary

17

nutritional precautions including keeping sugar out of [their] diet" and following "healthful dietary recommendation[s]." Id. at 90.

Asked "[w]here in Jewish law is there a prohibition against immunization," NM responded that "[t]here is a commandment that says protect your health greatly." Id. at 86-87; see also id. at 38 (noting "that one of the positive commandments in the Torah is to guard your health greatly"). However, she conceded that vaccinations are one method of protecting your health, and that immunizations do, in fact, protect people from disease. Id. at 87, 99. Crucial to this case, NM testified on cross-examination that, when it comes to vaccinations, her objection is based, in part, on "contraindications" and "side effects." Id. at 101.

## II.    Discussion

By this motion, the Plaintiffs seek preliminary relief in the form of a mandatory injunction, during the pendency of this lawsuit, requiring the School Defendants to: (i) reinstate the Minors' religious exemption; and (ii) admit them to HALB without the State-mandated vaccinations.

## A.    The Preliminary Injunction Standard

"To obtain a preliminary injunction, plaintiff must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108 (2d Cir. 2006) (citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)); see Christian Louboutin

S.A. v. Yves Saint Laurent America Holding, Inc., 696 F.3d 206, 215 (2d Cir. 2012); Rossini v. Republic of Arg., 453 F. App'x 22, 24 (2d Cir. 2011).

"When the movant seeks a 'mandatory' injunction — that is, as in this case, an injunction that will alter rather than maintain the status quo – she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." Rossini, 453 F. App'x at 24 (citing Citigroup Global Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010)); see D.D. v. N.Y. City Bd. of Educ., 465 F.3d 503, 510 (2d Cir. 2006) ("A party moving for a mandatory injunction that alters the status quo by commanding a positive act must meet a higher standard . . . That is, '[t]he moving party must make a clear or substantial showing of likelihood of success' on the merits" (quoting Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996))).

The Court notes that "the preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.' " Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir 2007) (quoting Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985)); see Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (" 'It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion' " (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995))); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) ("An award of an injunction is not something a plaintiff is entitled to as a matter of

right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief"). Accordingly, the Court has "wide discretion in determining whether to grant a preliminary injunction." Moore v. Consol. Edison Co., 409 F.3d 506, 510 (2d Cir. 2005).

## B.     The First Element – Irreparable Harm

The first and the most important part of the preliminary injunction standard is whether the Plaintiffs will suffer irreparable harm if an injunction does not issue. See Singas Famous Pizza Brands Corp. v. New York Adver. LLC, 468 F. App'x 43, 45 (2d Cir. 2012) (" 'A showing of irreparable harm is *the single most important* prerequisite for the issuance of a preliminary injunction' " (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)) (emphasis supplied)).

The Court notes that, under circumstances similar to those presented here, school-aged children have been deemed irreparably injured as a result of being excluded from attending classes. See, e.g., Caviezel v. Great Neck Public Sch., 701 F. Supp. 2d 414, 426 (E.D.N.Y. 2010) (Spatt, J.), aff'd, 500 F. App'x 16 (2d Cir. 2012), cert. denied, __ U.S. __, 133 S. Ct. 1997, 185 L. Ed. 2d 866 (2013). Thus, under the facts of this case, the exclusion of NM's minor children from HALB is certainly evidence of irreparable harm to them.

However, even assuming that this element of the preliminary injunction standard is established, the Plaintiffs have nevertheless failed to sustain their burden of showing a clear or substantial likelihood of succeeding on the merits of

their federal and state claims.  Thus, as set forth more fully below, a preliminary injunction is not warranted.

## C.     The Second Element – Likelihood of Success on the Merits

As the Plaintiffs acknowledge, similar challenges to school administrators' enforcement of the religious exemption from PHL § 2164 have consistently been rejected by this and other courts, and in the process, have generated a body of controlling authority which is dispositive of the claims at issue here.  <u>See, e.g.</u>, <u>Caviezel</u>, <u>supra</u>, and, more recently, <u>Phillips v. City of New York</u>, 775 F.3d 538 (2d Cir. 2015), <u>cert. denied</u>, __ U.S. __, 136 S. Ct. 104, 193 L. Ed. 2d 37 (2015).

In this regard, the Court finds the facts of this case to be analogous to those in <u>Caviezel</u>.  In that case, the plaintiffs sought a preliminary injunction compelling the defendant school district to register their four-year old daughter in a pre-K program without receiving the State-mandated vaccinations.  Invoking PHL § 2164(9), the plaintiffs contended that their genuine and sincerely-held religious beliefs forbade them from immunizing their children.  More particularly, the mother, a self-identified "pantheist," had testified that she saw vaccines as unnecessary because the form of human beings, as created by God, was already "a perfect creation."  Similar to NM, the mother in that case "ma[de] a distinction between taking medications because of a disease, and immunization which is putting disease into the body."  In that regard, she testified that her choices were "personal" and that she took Motrin for headaches and gave Motrin and peppermint oil to her children for headaches, fevers, and earaches.

21

In the <u>Caviezel</u> case, the "church" with which the plaintiff was affiliated, namely, the Church of the Beloved, took no position on the propriety of vaccination and had not instructed the plaintiff that she could not get her daughter immunized for school. In fact, the plaintiff's other children had received vaccinations. At a hearing, it was revealed that the mother also objected to vaccinations because she was unsure whether they are safe or whether they can cause autism.

On those facts, this Court found that the plaintiff had failed to establish a "genuine and sincere religious belief," as required by the relevant statute. In particular, the Court noted that, although it was clear that the family sincerely and genuinely opposed vaccinations for the child at issue, the evidence did not establish that those objections were religious in nature. The Court noted that there was no evidence that the plaintiff's church expressed opposition to vaccinations. Further, the Court noted that "one of the reasons" behind the plaintiffs' objection to vaccinations was that the practice "may not be safe." Acknowledging that "[h]er concern in that regard [wa]s real, and understandable," the Court nevertheless held that "it [wa]s not based on a religious belief," but on reasons of health.

Further, the Court noted that although the mother felt that the body was God's perfect creation, she conceded that she had taken Motrin and essential oils, and had administered them to her daughter, thereby "indicating a selective personal belief – not a religious belief." Thus, having found that the plaintiffs in the <u>Caviezel</u> case failed to establish a genuine and sincerely-held religious belief

contrary to vaccinating, the Court found no likelihood of success on their federal and state claims, and denied preliminary injunctive relief.

In the Court's view, the facts in this case warrant the same result. In particular, the Court does not doubt that NM and her husband hold a genuine and sincere belief that they should not vaccinate the Minors. As this Court acknowledged in <u>Caviezel</u>, NM's beliefs in this regard are "real, and understandable." However, careful consideration of the current record suggests that these beliefs were formed with a primary view toward the children's health, and not their religion. In this regard, the record clearly does not support a finding that Orthodox Judaism, even as interpreted by these particular Plaintiffs, forbids the practice.

The evidence shows that the Plaintiffs are devoutly religious. However, the evidence connecting this faith to their objection to vaccinating the Minors is tenuous. Initially, as noted, the Plaintiff concedes that there is no tenet of the Orthodox Jewish religion that prohibits the practice of vaccinating. In fact, the evidence shows that, of the approximately 1,700 Orthodox Jewish students at HALB, only a small minority of families, including NM and her husband, purport to interpret Judaic law as prohibiting the practice.

Further, as was true in <u>Caviezel</u>, there is evidence in this case to indicate that NM holds "a selective personal belief" against the practice of vaccinating, as opposed to "a religious belief." In this regard, NM relies primarily on the Torah's commandment to guard the body against disease. However, NM testified that she

applies this rule flexibly; that it is her prerogative to determine the best method of guarding the Minors' bodies against disease; and that the full force of Jewish law should attach to her decisions. Of importance, NM concedes that Jewish law "does not preclude" the use of immunizations, and that vaccines do, in fact, protect the body against disease. See id. at 99. However, in her opinion, immunizations are "not the preferred method," id., and she believes that her lifestyle choices, namely, utilizing nutrition as "the highest form of healing," more closely comport with the principles of "liv[ing] in accordance with the order of creation in nature," see Pl. Aff. ¶¶ 15-17. In the Court's view, these facts indicate selective personal beliefs against the practice of vaccinating, not fundamental religious beliefs.

The selectivity with which NM applies the Torah's commandments is also apparent in other parts of her testimony. For example, she has pierced ears, contradicting her purported belief against making cuttings in the skin. She ingests prenatal vitamins because they are doctor recommended, apparently without regard for whether vaccinations are similarly recommended. She permits Novocaine to be injected into her body by a dentist, undermining her objection to foreign impure substances being inoculated into the body. And, despite testifying that Jewish law forbids prophylactic remedies for healthy individuals, she applies sunblock to her daughters' skin to prevent adverse health effects of sun exposure.

In reaching its conclusion, the Court takes special note of NM's testimony that, when it comes to vaccinations, her objection is based, in part, on "contraindications" and "side effects." This is consistent with the e-mail prepared

by her husband seeking reconsideration of HALB's determination, which she has not materially disputed. In that e-mail, the husband states that the family's pediatrician educated them as to "the pros and cons of vaccinating" the Minors, and only then did they consult a Rabbi to obtain "a *halachic* stamp of approval." In the Court's view, this evidence supports the conclusion that the Plaintiffs' concerns are substantially health-based, rather than based on sincere and genuine religious beliefs.

Accordingly, the Court finds that the Plaintiffs have not sustained their burden of establishing that they hold genuine and sincere religious beliefs against the practice of vaccinating. Thus, under the authority of <u>Caviezel</u> and its progeny, the Plaintiffs are not likely to succeed on the merits of their federal and state causes of action. Under these circumstances, a preliminary injunction is unwarranted.

## III. Conclusion

Based on the foregoing, the Court finds that the Plaintiffs have not shown that they hold genuine and sincere religious beliefs which prohibit vaccinations. Therefore, the Plaintiff's motion for a preliminary injunction is denied in all respects.

The parties are directed to contact United States Magistrate Judge Anne Y.

Shields to schedule discovery.

**SO ORDERED**

Dated:     Central Islip, New York
           January 9, 2016       */s/ Arthur D. Spatt*_____
                                 ARTHUR D. SPATT
                                 United States District Judge